IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

DUBLIN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR 315-001 |
| | ) | |
| BRENITA RACHELLE ARMSTRONG | ) | |

_____

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**
_____

Defendant Brenita Rachelle Armstrong, facing charges of possession with intent to distribute cocaine, moves the Court to suppress evidence seized during a detention and vehicle search on February 28, 2014. (Doc. nos. 17, 19.) Having considered all arguments by the parties, along with all exhibits and sworn testimony provided from the evidentiary hearing, the Court hereby **REPORTS** and **RECOMMENDS** that the motion be **DENIED**.

I.   **FACTS**

On February 26, 2014, Investigator Ryan Alexander, a DEA Task Force Agent from the Glynn County Sheriff's Department, made an application for an order authorizing the use of a tracking device on any Enterprise rental car rented by Defendant. (Govt. Ex. 1A; Court's recording system, *For The Record*, (hereinafter "FTR"), 10:25:50 – 29:55.) The information supporting Inv. Alexander's application primarily came from three confidential sources. (Govt. Ex. 1A, ¶ 2; FTR 10:30:50 – 10:36:30.) The first source, known as Confidential Informant #13-1135001, informed Inv. Alexander and DEA Special Agent Rufus A. Wallace that Rafael Baker was a major drug trafficker in Glynn County. (Gov't Ex. 1A., ¶ 2.A; FTR 10:30:50 – 10:32:19.) The second source, referred to as CS, informed Inv. Alexander and a deputy that Baker was

receiving approximately two to five kilograms of cocaine per week from Donnie "Cleotis" Holmes in the Atlanta area. (Gov't Ex. 1A., ¶ 2.B; FTR 10:32:20 – 10:34:30.)

The third confidential source, referred to as CI-1, informed Investigator Matt Wilson that Baker was obtaining approximately two to four kilograms of cocaine per week and that Defendant Brenita Armstrong, who lived on Treville Avenue in Brunswick, was obtaining the drugs for Baker from Atlanta. (Gov't Ex. 1A., ¶ 2.C; FTR 10:34:51 – 10:36:30.) According to CI-1, Defendant would rent vehicles from the Brunswick Enterprise on Altama Avenue and drive to Atlanta to obtain the drugs for Baker. (Gov't Ex. 1A., ¶ 2.C; FTR 10:34:51 – 10:36:30.) Defendant would then drive back to Brunswick, and Baker would retrieve the drugs from her residence at a later time. (Gov't Ex. 1A., ¶ 2.C; FTR 10:34:51 – 10:36:30.) Baker paid Defendant for the drug runs in cash and also in cocaine for her to distribute. (Gov't Ex. 1A, ¶ 2A.) After obtaining this information from CI-1, Inv. Wilson conducted surveillance at Defendant's residence and observed Defendant driving a rental car from Enterprise. (Gov't Ex. 1A., ¶ 2.C; FTR 10:36:30 - 10:37:22.) Inv. Wilson conveyed to Inv. Alexander all of the information obtained from CI-1. (Gov't Ex. 1A., ¶ 2.C; FTR 10:34:51 – 10:36:30.)

Inv. Alexander confirmed the information by interviewing CI-I on February 6, 2014 and by conducting surveillance of Defendant's residence on February 12, 2014. (Gov't Ex. 1A, ¶ 2.D; FTR 10:37:22-10:37:55.) While conducting surveillance, Inv. Alexander verified that an Enterprise rental car was located at Defendant's residence by checking the tag of the vehicle. (Gov't Ex. 1A ¶ 2.D.) Inv. Alexander also observed a female matching the description of Defendant operating the vehicle and returning it to Enterprise on Altama Avenue. (Gov't Ex. 1A ¶ 2.D.) The tracking device application detailed all of the information gathered by Invs. Wilson

and Alexander, and on February 26, 2014, Judge Stephen D. Kelly of the Brunswick Judicial Circuit authorized the installation and use of a tracking device on any Enterprise rental vehicle leased to Defendant. (Gov't Ex. 1B; FTR 10:38:13 – 10:38:40.)

On February 27, 2014, Inv. Alexander and several other officers established surveillance at Enterprise on Altama Avenue and placed the tracking device on a silver Ford Focus rented by Defendant. (Gov't Ex. 3A; FTR 10:40:10 – 10:41:32.) Shortly after Inv. Alexander placed the tracking device, Defendant left Enterprise in the silver Ford Focus. (Gov't Ex. 3A, ¶¶ 3-5, FTR 10:41:40 – 10:44:29.) Inv. Wilson observed Defendant arrive at her residence after leaving Enterprise in the rental vehicle and later re-established surveillance of Defendant on I-95 northbound in Glynn County, Georgia. (Gov't Ex. 3A, ¶¶ 6-7; FTR 10:44:30 – 10:44:45.) From this point, the team of investigators observed Defendant, through electronic and physical surveillance, travel from Brunswick to the Atlanta area, making a few routine stops along the way. (Gov't Ex. 3A, ¶¶ 7-19; FTR 10:45:15 – 10:47:17.)

Shortly before 11:00 p.m. and approximately five and half hours after Inv. Wilson observed Defendant leaving Brunswick, Investigator James Cassada observed Defendant arrive at The Landings at Princeton Lakes Apartment Complex in Atlanta, Georgia. (Gov't Ex. 3A, ¶ 19; FTR 10:49:05 – 10:49:40.) Although Inv. Cassada could not follow Defendant into the gated complex at first, SA Wallace and Inv. Wilson were able to enter through the north gate. (Gov't Ex. 3A ¶ 19.) SA Wallace and Inv. Wilson observed Defendant emerge from a breezeway in the apartment complex carrying a bag approximately an hour and a half after she arrived. (Gov't Ex. 3A, ¶ 20; FTR 10:49:40 – 10:49:56.) They also observed Defendant place the bag into the trunk of her vehicle. (Gov't Ex. 3A, ¶ 20; FTR 10:49:40 – 10:49:56.) After leaving Princeton Lakes

Apartment Complex, Plaintiff travelled to Gables Mills Apartments in Atlanta, Georgia. (Gov't Ex. 3A, ¶ 21; FTR 10:50:05 – 10:50:23.) Plaintiff left Gables Mills Apartments after only a short stay of approximately ten minutes. (Gov't Ex. 3A, ¶¶ 21-22; FTR 10:50:15 – 10:50:27.) At approximately 2:55 a.m., Defendant retired to La Quinta Inn in Locust Grove, Georgia, south of Atlanta. (Gov't Ex. 3A, ¶ 28; FTR 10:50:27 – 10:51:24.) Defendant left the hotel around 10:00 a.m. the next day travelling southbound on I-75 toward Brunswick. (Gov't Ex. 3A, ¶ 29; FTR 10:51:24 – 10:51:38.)

After Defendant left the hotel, SA Wallace contacted Sergeant Christopher Brewer of the Laurens County Sheriff's Department to inform him that the DEA was conducting an investigation of a Brunswick resident on a return trip from Atlanta and that they believed the individual currently possessed narcotics. (FTR 12:00:56 – 12:01:59.) SA Wallace advised Sgt. Brewer to contact a deputy and have the vehicle stopped, with the instruction that the deputy should observe the vehicle for a time to see if there might be an independent basis for the stop. (FTR 12:01:23 – 12:01:59.) SA Wallace advised that the deputy should stop the vehicle even in the absence of an independent basis (Id.) SA Wallace testified he wanted an independent basis for the stop to conceal involvement of the DEA in the investigation of Rafael Baker's drug organization. (FTR 12:03:21 – 12:03:51.)

Sergeant Brewer contacted Corporal Brian Stokes to make the stop of Defendant, and he relayed the information and instructions obtained from SA Wallace. (FTR 11:10:00 – 11:10:50.) Sometime after 11:00 a.m. on February 28, 2015, Sgt. Brewer, who was following the vehicle, informed Corporal Stokes that the vehicle was approaching Corporal Stokes' position on I-16, travelling east in the left hand lane. (FTR 11:10:50 – 11:11:31.) Corporal Stokes observed

4

Defendant's vehicle pass a tractor-trailer and smaller vehicle in front of the tractor-trailer and then move from the left-hand lane to the right-hand lane without using a turn signal. (FTR 11:11:31 - 11:11:50.) Corporal Stokes testified that the traffic was moderately heavy that day and that such a lane change was in contravention of Georgia law. (FTR 11:11:50 - 11:12:47.)

Upon seeing the lane change without the signal, Corporal Stokes conducted a traffic stop. (FTR 11:13:00 – 11:13-21.) Corporal Stokes approached the passenger side of the vehicle and asked for Defendant's license, asked Defendant to step to the rear of the vehicle, explained that he stopped her because of the traffic violation, and advised that he was going to issue a written warning. (FTR 11:13:29 - 11:14:36.) Corporal Stokes continued to converse with Defendant at the rear of the vehicle while writing Defendant's warning. (FTR 11:14:36 - 11:14:59.) Approximately eight minutes after first approaching the passenger-side window, Corporal Stokes issued the warning to Defendant. (Gov't. Ex. 4, 11:28:40; FTR 11:16:30 – 11:16:45.)

Corporal Stokes then asked Defendant for consent to search her vehicle and upon her refusal, requested a K-9 unit to the location. (Gov't Ex. 4, 11:29:34; FTR 11:16:45 – 11:17:20.) Glen Townsend of the Georgia Department of Corrections arrived with Luna, a drug dog certified to detect cocaine, approximately four minutes after Corporal Stokes issued the warning. (Gov't. Ex. 2A, 11:33:15; FTR 11:18:51 – 11:19:28.) Luna alerted to the presence of drugs in the vehicle at the front right tire less than two minutes after arriving upon the scene and about six minutes after Corporal Stokes issued the warning. (Gov't. Ex. 4, 11:34:55; FTR 11:19:28 – 11:19:39.) Upon searching the vehicle, Corporal Stokes and the accompanying officers found a bag containing 1.5 kilograms of cocaine in the trunk. (FTR 11:19:45 – 11:20:23.) In total, the

traffic stop lasted approximately fourteen minutes from the time Defendant stopped the vehicle until Luna alerted to the presence of drugs. (Gov't Ex. 4.)

## II. DISCUSSION

### A. The Facts Gleaned from the Investigation of Defendant Established Probable Cause for the Traffic Stop and Search of Defendant's Rental Car.

Where a party moves for the suppression of evidence, the movant bears the initial burden of showing that he or she was subjected to a search or seizure and that the evidence in question should be suppressed; in the context of a warrantless search or seizure, the burden then shifts to the government to show that the encounter was consensual or that the search or seizure was justified. See United States v. de la Fuente, 548 F.2d 528, 533 (5th Cir. 1977) [1]; United States v. Beckham, 505 F.2d 1316, 1318 (5th Cir. 1975).

Under the automobile exception to the warrant requirement, law enforcement officers may search a readily mobile vehicle without a warrant if they have probable cause to believe that the vehicle contains evidence of a crime. United States v. Ross, 456 U.S. 798, 799, 102 S.Ct. 2157, 2160, 72 L.Ed.2d 572 (1982). In deciding whether probable cause exists to stop and search a vehicle, the inquiry is whether the totality of the circumstances indicate that "there is a fair probability that contraband or evidence of a crime will be found in the vehicle." United States v. Tamari, 454 F.3d 1259, 1264 (11th Cir.2006), accord United States v. Lindsey, 482 F.3d 1285, 1293 (11th Cir.2007). "[P]robable cause deals 'with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable

---

[1] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*), the Eleventh Circuit adopted as binding precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981.

6

and prudent men, not legal technicians, act.'" U.S. v. Miller, 24 F.3d 1357, 1361 (11th Cir. 1994) (quoting Illinois v. Gates, 462 U.S. 213, 232 (1983).

These probabilities need not come from direct observation but may be inferred from the particular circumstances. U.S. v. Jenkins, 901 F.2d 1075, 1080 (11th Cir. 1990). Probable cause may also be based on evidence that would not be legally competent in a criminal trial. Draper v. U.S., 358 U.S. 307, 311-12 (1959). "[P]robable cause is a fluid concept turning on the assessment of probabilities in particular factual contexts. . . ." Gates, 462 U.S. at 232. In making this determination, a court may also "examine the collective knowledge of law officers if they maintained at least a minimal level of communication during their investigation." United States v. Willis, 759 F.2d 1486, 1494 (11th Cir.1985)).

The "totality of the circumstances" inquiry also involves balancing relevant considerations of a confidential informant's veracity, reliability, and basis of knowledge in order to assess the credibility of his or her information, and a deficiency in one can be made up by a strong showing in another. Gates, 462 U.S. at 230. However, "[w]hen there is sufficient independent corroboration of an informant's information, there is no need to establish the veracity of the informant." United States v. Martin, 297 F.3d 1308, 1314 (11th Cir. 2002).

Here, the collective knowledge of the officers involved in the investigation provided probable cause to search Defendant's vehicle. At the time of the search, the officers had developed information from three confidential informants regarding a pattern of Rafael Baker in Brunswick purchasing large quantities of cocaine from Donnie "Cleotis" Holmes in Atlanta. (Govt. Ex. 1A, ¶ 2; FTR 10:30:50 – 10:36:30.) CI-1 specifically identified Defendant as a drug courier for Baker that often made runs to buy drugs from "Cleo" or "Bootney," utilizing an

Enterprise rental car. (Govt. Ex. 1A, ¶ 2; FTR 10:30:50 – 10:36:30.) Both the second confidential informant and CI-1 indicated familiarity with Rafael Baker's drug operation in identifying a specific amount of cocaine that was being transported to Brunswick, two to five kilograms of cocaine per week. (Govt. Ex. 1A, ¶ 2; FTR 10:32:20 – 10:36:30.) Inv. Alexander, before making an application for the tracking warrant, also independently verified that an Enterprise rental vehicle was at Defendant's residence through verification of the tag, and he observed a person matching the description of Defendant driving that vehicle. (Gov't Ex. 1A, ¶ 2.D; FTR 10:37:22-10:37:34.) Inv. Alexander, along with other DEA agents, also observed Defendant later rent another vehicle from Enterprise when they placed the tracking device. (Gov't Ex. 3A; FTR 10:40:10 – 10:41:32.)

Inv. Alexander, along with other agents, also further corroborated the tip from CI-1 that Defendant was a drug courier by observing Defendant drive approximately five and half hours to Atlanta from Brunswick to visit two apartment complexes. (Gov't Ex. 3A.) Defendant's stay at each complex was relatively short, and the officers observed Defendant leaving one apartment with a bag that she placed in the trunk of her car. (Gov't Ex. 3A, ¶ 20; FTR 10:49:40 – 10:49:56.) Having spent only four hours in the Atlanta area, Plaintiff retired to a motel room in Locust Grove, Georgia at about 2:30 a.m., only to leave again approximately seven hours later. (Gov't Ex. 3A, ¶ 29; FTR 10:51:24 – 10:51:38.) Clearly, by the time Defendant checked out of her hotel on February 28th and resumed her trip home from Atlanta in the rental car, there was a fair probability, amounting to probable cause, that Defendant's car contained drugs. The aggregate knowledge of all officers is imputed to Corporal Stokes, the officer who made the stop, because of the communications and coordination of effort between the investigative team,

8

Sgt. Brewer, and Corporal Stokes. See Willis, 759 F.2d at 1494; United States v. Kapperman, 764 F.2d 786, 791 n.5 (11th Cir. 1985).

> **B. Corporal Stokes Also Had Probable Cause to Stop Defendant for a Traffic Violation, Reasonable Suspicion to Detain Defendant for a Free Air Sniff, and Probable Cause to Search the Vehicle Based on a Reliable Alert from Luna.**

"A seizure for a traffic violation justifies a police investigation of that violation." Rodriguez v. United States, No. 13-9972, 2015 WL 1780927, at *5 (U.S. Apr. 21, 2015). A routine traffic stop is a relatively brief encounter and "is more analogous to a so-called 'Terry stop' . . . than to a formal arrest." Knowles v. Iowa, 525 U.S. 113, 117 (1998) (quoting Berkemer v. McCarty, 468 U.S. 420, 439, (1984)). The reasonableness of an investigative stop, including a traffic stop, turns on two inquiries: (1) whether the stop was reasonable at its inception, and (2) whether the stop became unreasonable in its scope or duration. See United States v. Acosta, 363 F.3d 1141, 1144-45 (11th Cir. 2004); see also United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001). As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred. Whren v. United States, 517 U.S. 806, 810 (1996).

Here, Corporal Stokes testified that he observed Defendant make a lane change in moderately heavy traffic without using a signal in violation of O.C.G.A § 40-6-123. (FTR 11:11:31 - 11:12:47.) As correctly interpreted by the Georgia Court of Appeals, O.C.G.A. § 40–6–123 mandates a vehicle to signal before changing lanes when other drivers are in the vicinity. See O.C.G.A. § 40–6–123; Salinas-Valdez v. State, 624 S.E.2d 278, 280 (2005); Tukes v. State, 511 S.E.2d 534, 536 (1999). Corporal Stokes also testified that Defendant made the lane change shortly after passing a tractor-trailer and a small car. (FTR 11:11:31 - 11:12:47.) Whether or not

9

Corporal Stokes' stop was for the actual purpose of a drug investigation is irrelevant because "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." Whren, 517 U.S. at 813. Given the moderate traffic conditions and proximity of other vehicles, there was probable cause to believe that Defendant made a lane change without a signal in violation of O.C.G.A. § 40-6-123.

The stop was also reasonable in duration of approximately fourteen minutes when measured from the time Defendant's vehicle stopped to the moment Luna alerted to drugs. See Purcell, 236 F.3d at 1277 (finding a fourteen-minute stop to issue a citation to be reasonable). It took Corporal Stokes only eight minutes to issue the traffic warning, which certainly falls within the range of reasonableness allowed for such stops, and indeed, Defendant does not argue that time was unreasonable. See id; United States v. Hardy, 855 F.2d 753, 758 (11th Cir.1988). Defendant only argues that the stop became unreasonable in duration when, after the warning was issued and Defendant asked to leave, she had to wait six minutes for Luna to arrive and conduct a free air sniff. (See doc. no. 19, pp. 10-11.)

As the Supreme Court recently held in Rodriguez, an officer may not prolong an otherwise lawful traffic stop to conduct a free air sniff absent reasonable suspicion of criminal activity. See Rodriguez, No. 13-9972 at *5. At the very least, Corporal Stokes had reasonable suspicion of illegal drug activity to detain Defendant for a short amount of time and conduct a free air sniff based on the aggregate knowledge of all officers imputable to him. Indeed, the information known collectively by the investigators by the time of the traffic stop was so compelling that probable cause existed to search the vehicle even in the absence of an alert by

Luna. Thus, the decision to initially hold Defendant for the free air sniff was reasonable at its inception.

Once reasonable suspicion exists to extend a traffic stop into an investigative detention, the detention must be "sufficiently limited in scope and duration within the bounds permitted by Terry." Hardy, 855 F.2d at 758. Relevant considerations include: "(1) the law enforcement purpose served by the detention; (2) the diligence with which the officers pursued the investigation; (3) the scope and intrusiveness of the investigation; and (4) the duration of the detention." United States v. Street, 472 F.3d 1298, 1306 (11th Cir. 2006). Here, Defendant was detained for a very brief period of time to allow a free air sniff of the outside of the car, a minimally intrusive action. See United States v. Mostowicz, 471 F. App'x 887, 889 (11th Cir. 2012). Once the purpose of the stop transitioned from issuing a warning for a traffic violation into a drug investigation, the officers diligently pursued their investigation by quickly having Luna arrive within four minutes of issuing the warning and immediately conducting the free air sniff upon Luna's arrival. (See Gov't Ex. 4.) Thus, the short six-minute extension of the stop for the purpose of a free air sniff was not unreasonable.

There was also probable cause to search the car once Luna alerted to the presence of drugs in the car. An alert from a narcotics detection canine establishes probable cause if "all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." Florida v. Harris, 133 S. Ct. 1050, 1058, (2013). At the hearing, Defendant wisely conceded the obvious truth that Luna is properly trained and certified by the National Police Canine Association, and "training of a dog alone is sufficient proof of reliability." United States v.

Smith, 448 F. App'x 936, 939 (11th Cir. 2011); (FTR 12:20:35 - 12:20:56.) However, Defendant maintained that Luna's alert at the front right tire was not sufficient to justify a search of the entire car, given that the cocaine was found in the trunk. Here, Luna's handler testified Luna typically alerts in the area where the strongest scent is located and not necessarily where the drugs are located. (FTR 11:52:53 - 11:53:09.) Corporal Stokes also testified that the strong airflow from the interstate was the probable reason for the alert toward the front of the car. (FTR 11:41:05 - 11:41:31.) Given this testimony, and the fact that investigators saw Defendant put a bag in her trunk upon exiting the first apartment she visited in Atlanta, it was reasonable to think that drugs would likely be found in the body or trunk of the car even though Luna alerted at the front right tire. Thus, there was probable cause for a search of the entire car.

### III. CONCLUSION

Because Corporal Stokes had probable cause top search Defendant's rental vehicle on February 28, 2014, the Court **REPORTS** and **RECOMMENDS** that Defendant's motion to suppress be **DENIED**. (Docs. no. 17, 19.)

SO REPORTED and RECOMMENDED this 1st day of May, 2015, at Augusta, Georgia.

_____
BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA